FILED
RICHARD W. NAGEL
CLERK OF COURT

2017 FEB 28 PM 12: 32

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO.** |
| | : | |
| **Plaintiff,** | : | **JUDGE** |
| | : | |
| v. | : | 2:17 cr 50 |
| | : | **INDICTMENT** |
| | : | 18 U.S.C. § 1349 |
| **DANIEL EMERSON NORTON,** | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 1956(a)(1)(A)(i) |
| **TIMOTHY M. KELLY, and** | : | 18 U.S.C. § 1957 |
| | : | |
| **EMERSON MANUFACTURING** | : | **FORFEITURE ALLEGATIONS** |
| **COMPANY, INC.** | : | |
| | | |
| **Defendants.** | | |

Judge Graham

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

At all times relevant to this Indictment:

***The Parties***

1.    Defendant **DANIEL EMERSON NORTON ("NORTON")** resided in Kihei, Hawaii and was a Director and the President of **EMERSON MANUFACTURING COMPANY, INC. ("EMERSON MANUFACTURING")**.

2.    Defendant **TIMOTHY M. KELLY ("KELLY")** resided in Rancho Palos Verdes, California and was a Director and the Chief Executive Officer of **EMERSON MANUFACTURING**.    Defendant **KELLY** was also listed as the Registered Agent on the Corporation filings in California for **EMERSON MANUFACTURING**.

3.    Emerson Company, a sole proprietorship held by Defendant **NORTON**, was a Department of Defense (DOD) contractor that was issued CAGE Code 4BUR2 on March 8, 2006.

Emerson Company was located in Torrance, California, and according to its website (http://www.emersoncompany.net), was "a designer, manufacturer and distributor of quality products and product components. The company provides contract manufacturing services to aerospace, defense and commercial markets." Defendant **NORTON** was the Defense Logistics Agency (DLA) primary point of contact for Emerson Company, while Defendant **KELLY** served as the office manager. Emerson Company was debarred by the Defense Logistics Agency (DLA) from doing business directly with the U.S. Government from September 26, 2011 to June 13, 2014.

4. **EMERSON MANUFACTURING COMPANY, INC.,** ("**EMERSON MANUFACTURING**") was incorporated in California on August 13, 2009. **EMERSON MANUFACTURING** was located in the same office space as Emerson Company in Torrance, California. It was also temporarily located in Gardena, California from in or about April 2013 until in or about 2015. On February 28, 2014, an Application for Certificate of Authority as a Foreign Corporation was filed with the State of Hawaii on behalf of **EMERSON MANUFACTURING,** which listed Defendant **NORTON** as the Registered Agent.

5. Although Emerson Company and **EMERSON MANUFACTURING** are technically separate entities, the financial accounts for each entity were used interchangeably.

6. Company # 1, known to the Grand Jury but not identified herein, was located in Pennsylvania. Company # 1 was a DOD contractor that received its CAGE Code on January 14, 2009. Company # 1 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

7. Company # 2, known to the Grand Jury but not identified herein, was located in California. Company # 2 was a DOD contractor that received its CAGE Code on May 2, 2009.

2

Company # 2 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

8.      Company # 3, known to the Grand Jury but not identified herein, was located in Pennsylvania. Company # 3 was a DOD contractor that received its CAGE Code on December 10, 2010. Company # 3 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

9.      Company # 4, known to the Grand Jury but not identified herein, was located in California. Company # 4 was a DOD contractor that received its CAGE Code on April 7, 2011. Company # 4 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

10.      Company # 5, known to the Grand Jury but not identified herein, was located in Maryland. Company # 5 was a DOD contractor that received its CAGE Code on May 6, 2011. Company # 5 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

11.      Company # 6, known to the Grand Jury but not identified herein, was located in Hawaii. Company # 6 was a DOD contractor that received its CAGE Code on January 18, 2012. Company # 6 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

12.     Company # 7, known to the Grand Jury but not identified herein, was located in California.  Company # 7 was a DOD contractor that received its CAGE Code on October 29, 2012.  Company # 7 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

13.     Company # 8, known to the Grand Jury but not identified herein, had a business address in Florida, but the owner resided in Hawaii.  Company # 8 was a DOD contractor that received its CAGE Code on March 29, 2013.  Company # 8 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

14.     Company # 9, known to the Grand Jury but not identified herein, has a business address in Nevada, but the owner resided in California and was an employee of Emerson Company.  Company # 9 was a DOD contractor that received its CAGE Code on October 4, 2011.  Company # 9 supplied parts to the DOD for use by the United States Military that it had obtained or ordered through Emerson Company, in reliance that Defendants **NORTON** and **KELLY** would supply the correct parts.

15.     N.S., Inc., owned by an individual identified herein by the initials "B.C.," is a manufacturing company incorporated in Texas, but whose operations are located in Suzhou, China.  N.S., Inc. assisted customers, including Defendants **NORTON** and **KELLY**, in obtaining Chinese manufactured parts at competitive prices.

*The Process*

16.     The Department of Defense (DOD), through its various agencies, such as the DLA Land & Maritime (L&M), located in Columbus, Ohio, within the Southern District of Ohio, contracted with private individuals and companies for the supply of various items for component parts and end products to be used by members of the United States military. The DOD required that all parts purchased be in conformity with the required government specifications.

17.     Generally, the process to contract with the DOD worked as follows: the DOD issued "solicitations" electronically, which DOD contractors then responded to with quotes, also electronically; based on quotes received, the DOD issued Purchase Orders to a specific contractor for specific required parts. If a contractor bid "without exception," it meant that the "exact product" would be furnished under the contract. The DLA L&M solicitations and Purchase Orders listed the DOD requirements (drawings or military and/or commercial specifications) for each part. The contractor was required to have a quality control system in place to ensure the parts they supplied to the DOD were in accordance with all DOD drawings and specifications, prior to shipping the parts to the DOD. Once shipped, the contractor submitted an invoice to the DOD electronically, representing that the parts shipped met the required government specifications. Upon receiving an invoice, the DOD, through the Defense Finance and Accounting Service (DFAS), also located in Columbus, Ohio, in the Southern District of Ohio, issued electronic payment to the supplying contractor and retained a voucher as a record of the payment.

18.     DOD contractors must be registered in the Central Contractor Registration (CCR), agree to receive payments electronically, and obtain a Commercial and Government Entity (CAGE) code. The CAGE code is a five-character identification number used extensively within the federal government, and assigned by DLA. The CAGE code is used to support a variety of

mechanized systems throughout the government and provides a standardized method of identifying a given contractor's facility, at a specific location.

19.     Certificates of Conformance (COCs) certify that on a particular date, a contractor furnished the supplies or services called for by a particular contract via an identified method of shipping and in accordance with all applicable requirements. The certificates further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specification, drawings, preservation, packaging, packing, marking requirements, and physical item identification (part number), and are in the quantity shown on the certificate or an attached acceptance document. In some instances, DOD requires that contractors submit COCs with the parts supplied.

20.     The various parts supplied as part of the scheme to defraud, as alleged below, did not meet the specified military requirements and specifications as listed in the Purchase Orders. The parts involved were designed to be utilized on military weapon systems to include aircraft, vessels, vehicles, and Nuclear Reactor programs. Many of the parts were considered critical application items. A critical application item was an item essential to weapon system performance or operation, or the preservation of life or safety of operating personnel, as determined by military services.

## COUNT 1
### (Conspiracy to Commit Wire Fraud)

21.     The factual allegations set forth in Paragraphs 1 through 20 of Introduction Section of this Indictment are re-alleged and fully incorporated by reference herein.

22.     Beginning at least as early as 2010 and continuing through in or about 2013, in the Southern District of Ohio and elsewhere, the defendants,

**DANIEL EMERSON NORTON, and**

6

## TIMOTHY M. KELLY

did knowingly and intentionally conspire and agree with others known and unknown to the grand jury to commit wire fraud, that is, to devise and intend to devise a scheme to defraud the United States Department of Defense and for obtaining money and property from the DOD by means of materially false and fraudulent pretenses, representations and promises, and material omissions, and for the purpose of executing the scheme, using wire communications in interstate commerce, in violation of 18 U.S.C. § 1343.

### The Object of the Conspiracy

23.     The object of the conspiracy was for the defendants to unlawfully enrich themselves by providing the Department of Defense and the United States Military nonconforming parts in response to at least 130 Purchase Orders awarded to contractors with active CAGE Codes at the defendants' request. As a result of the defendants' conspiracy to defraud and to fraudulently obtain money belonging to the DOD, the defendants illegally obtained approximately $2,137,363.18.

### Manner and Means of the Conspiracy

24.     The manner and means by which the defendants sought to accomplish the objective of the conspiracy include, but are not limited to, the following:

a.     Defendant **NORTON** recruited individuals who either already had companies, or were willing to start companies, for the purpose of bidding on solicitations and contracting with the DOD to provide parts for the United States Military under the guise of being manufacturers.

b.     Defendant **NORTON** assisted each newly created company with obtaining the required CAGE code to contract with the DOD.

7

c. Defendant **NORTON** emailed these contractors, identified above as Companies # 1 through # 9, to provide instruction on what price and delivery timeframe to quote for certain DOD solicitations. Often, Defendant **NORTON** would direct multiple companies to bid on the same solicitation, within pennies of each other, in an effort to ensure that one of the companies would be awarded the Purchase Order. Quotes were submitted electronically to the DOD by Companies #1 through #9.

d. When one of the companies was awarded a purchase order, Defendants **NORTON** and **KELLY** instructed the contractor to send the purchase order to Emerson Company, which would purchase and ship the part directly to the DOD.

e. Defendants **NORTON** and **KELLY** regularly communicated by email with the manufacturers and each other regarding quotes, specifications and other matters pertaining to the production of parts.

f. Defendants **NORTON** and **KELLY** often ordered a sample size of the correct part from a manufacturer in the United States and then arranged for the samples to be sent to China for production of the lot required for the purchase order.

g. Defendants **NORTON** and **KELLY** purchased parts identified in this indictment from, and on occasion traveled to, manufacturers in China, even though a large number of the purchase orders specified that parts be manufactured or obtained pursuant to the Buy American Act.

h. Defendants **NORTON** and **KELLY** also authorized the use of substituted materials in manufacturing some of the parts sold to the DOD, without notifying the DOD that they were altering the terms of the contracts nor seeking permission to do so.

8

i.      Defendants **NORTON** and **KELLY** also provided the DOD with parts that had dimensional defects, incorrect or missing markings, zinc plating in lieu of cadmium plating, incorrect finishes, improper shapes or styles, mislabeled packaging, or poor workmanship.

j.      Once Emerson Company received the part, Defendant **KELLY** oversaw the packaging and shipping of the part to the DOD.

k.      Defendants **NORTON** and **KELLY** did not send the part to the contractor who won the contract prior to Emerson Company shipping it to the DOD. Nevertheless, Defendants **NORTON** and **KELLY** would routinely instruct the contractor to sign a Certificate of Conformance (COC), initially prepared by Defendant **KELLY**, indicating the part had been inspected and met DOD specifications.

l.      Despite directing the contractor to sign the COCs, Defendants **NORTON** and **KELLY** submitted nonconforming parts for the purchase orders identified below and others.

m.      Once shipped, Defendant **KELLY** contacted the contractor who held the purchase order, usually through email, and instructed the owner to submit an invoice to the DOD electronically through the DFAS in Columbus, Ohio, representing that the parts have been shipped and met the required specifications.

n.      After DFAS issued the electronic payment for the invoice, Emerson Company invoiced the contractor for the full amount paid by DFAS, less a 10% discount. Therefore, 90% of the funds received by the contractors from DFAS on each contract were paid to Emerson Company, per the arrangement made with Defendants **NORTON** and **KELLY**.

**All in violation of Title 18, United States Code, Section 1343.**

**COUNTS 2-31**
(Wire Fraud)

25.     The factual allegations set forth in Paragraphs 1 through 20 of the Introduction Section of this Indictment are re-alleged and fully incorporated by reference herein.

26.     The allegations set forth in Count 1 are also incorporated by reference herein.

27.     Beginning at least as early as 2010 and continuing through in or about 2013, in the Southern District of Ohio and elsewhere, the defendants,

**DANIEL EMERSON NORTON, and**
**TIMOTHY M. KELLY**

knowingly devised and intended to devise a scheme to defraud the United States Department of Defense (DoD), and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

28.     On or about each of the dates listed below, in the Southern District of Ohio and elsewhere, the defendants, for the purpose of executing and attempting to execute the scheme described above in Count 1, caused to be transmitted in interstate commerce, by means of wire, radio, or television communications, certain writings, signs, signals, pictures or sounds, to wit: the wire transfer of funds by the Defense Finance and Accounting Service (DFAS) to the companies identified below for the Purchase Order (PO) listed, as described for each count:

| Count | Date of Offense | Contractor | DFAS Wire Communication |
|---|---|---|---|
| 2 | Oct. 17, 2012 | Company #2 | Transfer of $3,748.12 for PO ending #2819 |
| 3 | Nov. 5, 2012 | Company #2 | Transfer of $35,339.15, of which $30,450.00 was paid for PO ending #0369 |
| 4 | Oct. 22, 2012 | Company #2 | Transfer of $1,629.59, of which $275.41 was paid for PO ending #6356 |
| 5 | Oct. 15, 2012 | Company #2 | Transfer of $106,728.88, of which $106,453.47 was paid for PO ending #1256 |
| 6 | Oct. 11, 2012 | Company #2 | Transfer of $4,722.51 for PO ending #4560 |
| 7 | July 25, 2012 | Company #4 | Transfer of $39,591 for PO ending #1624 |
| 8 | Jan. 25, 2013 | Company #4 | Transfer of $1,594.10 for PO ending #0307 |
| 9 | July 30, 2012 | Company #5 | Transfer of $8,871.32, of which $8,372.00 was paid for PO ending #4390 |

10

| 10 | Mar. 5, 2012 | Company #5 | Transfer of $9,501.65, of which $2,310.29 was paid for PO ending #0954 |
|---|---|---|---|
| 11 | Mar. 26, 2012 | Company #5 | Transfer of $62,161.56, of which $11,964 was paid for PO ending #6514 |
| 12 | Aug. 31, 2012 | Company # 5 | Transfer of $111,420.00 for PO ending #0363 |
| 13 | Oct. 22, 2012 | Company #6 | Transfer of $28,025.93, of which $2,331.00 was paid for PO ending #6961 |
| 14 | May 14, 2012 | Company #6 | Transfer of $21,318.72 of which $408.90 was paid for PO ending #1701 |
| 15 | May 16, 2012 | Company #6 | Transfer of $1,030.33, of which $201.88 was paid for PO ending #1856 |
| 16 | Oct. 17, 2012 | Company #6 | Transfer of $15,991.92, of which $5,623.50 was paid for PO ending #4229 |
| 17 | Oct. 29, 2012 | Company #6 | Transfer of $102,700.18, of which $11,193.76 was paid for PO ending #2914 |
| 18 | Nov. 29, 2012 | Company #6 | Transfer of $43,550.28, of which $2,650.00 was paid for PO ending #LE54 |
| 19 | Nov. 29, 2012 | Company #6 | Transfer of $43,550.28, of which $2,850.00 was paid for PO ending #JQ22 |
| 20 | Aug. 20, 2012 | Company #6 | Transfer of $80,251.23, of which $36,208.00 was paid for PO ending #4227 |
| 21 | July 23, 2012 | Company #6 | Transfer of $5,033.40, of which $1,423.50 was paid for PO ending #2464 |
| 22 | Mar. 27, 2013 | Company #6 | Transfer of $1,366.75, of which $500.50 was paid for PO ending #1001 |
| 23 | Oct. 26, 2012 | Company #6 | Transfer of $6,199.83, of which $5,492.48 was paid for PO ending #5444 |
| 24 | July 3, 2013 | Company #7 | Transfer of $23,940.13, of which $6,947.90 was paid for PO ending #2511 |
| 25 | July 3, 2013 | Company #7 | Transfer of $23,940.13, of which $4,528.04 was paid for PO ending #4753 |
| 26 | Aug. 22, 2013 | Company #7 | Transfer of $48,934.56, of which $17,066.00 was paid for PO ending #3371 |
| 27 | Sept. 11, 2013 | Company #7 | Transfer of $30,510.20 for PO ending #3114 |
| 28 | Aug. 12, 2013 | Company #8 | Transfer of $2,311.75 for PO ending #8220 |
| 29 | Mar. 4, 2013 | Company #9 | Transfer of $6,930 for PO ending #2266 |
| 30 | Aug. 8, 2013 | Company #9 | Transfer of $29,168, of which $1,688.40 was paid for PO ending #1057 |
| 31 | Apr. 5, 2013 | Company #9 | Transfer of $19,610 for PO ending #MV20 |

**All in violation of 18 U.S.C. § 1343.**

**COUNT 32**
(False Statement)

29.     The factual allegations set forth in Paragraphs 1 through 20 of the Introduction Section of this Indictment are re-alleged and fully incorporated by reference herein.

30.     Title 41, United States Code, Section 8302, which is part of the Buy American Act, requires generally that American materials be acquired for public use.  In other words, the Buy American Act provides that the federal government give preference to products made in the United States when making certain purchases.

31.     From on or about May 18 2011, to on or about August 31, 2012, in the Southern District of Ohio and elsewhere, the defendants,

**DANIEL EMERSON NORTON, and**
**TIMOTHY M. KELLY**

did willfully and knowingly falsify, conceal, and cover up by trick, scheme, and device a material fact in a matter within the jurisdiction of the executive branch of the Government of the United States, namely that the defendants, through Emerson Company, supplied parts made in China to the DOD as part of PO ending 0363, while also instructing Company # 5 to represent that the parts would be provided in compliance with the federal Buy American requirements.

**Manner and Means**

32.     The manner and means by which Defendants **DANIEL EMERSON NORTON** and **TIMOTHY M. KELLY** falsified, concealed and covered up material facts from the United States was essentially as follows:

12

a. Defendant **NORTON** instructed the owner of Company #5 to bid on Request for Quotation #SPM7L2-11-A-1401, subject to I25B01 252.225-7001, *BUY AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM* (Jan 2009) DFARS.

b. Company # 5 was ultimately awarded this contract, which was PO ending #0363.

c. Despite the fact that PO ending #0363 required compliance with Buy American requirements, Defendants **NORTON** and **KELLY** ordered the requested parts from N.S. Inc. in China, which parts, the defendants then provided to the DOD.

d. To conceal the country of origin of the parts, Defendants **NORTON** and **KELLY** directed that the parts be shipped to Emerson Company in California for repackaging and labeling before shipment to the DOD.

e. Once shipped, Defendant **KELLY** contacted Company # 5 and instructed the owner to submit an invoice to the DOD electronically through the DFAS in Columbus, Ohio, representing that the parts have been shipped and met the required specifications, including Buy American.

**All in violation of 18 U.S.C. §§ 1001 and 2.**

## COUNTS 33-52
(Concealment Money Laundering)

33. The factual allegations set forth in Paragraphs 1 through 20 of the Introduction Section of this Indictment are re-alleged and fully incorporated by reference herein.

34. The allegations set forth in Counts 1 through 31 are also incorporated by reference herein.

35. Beginning at least as early as 2010 and continuing through in or about 2013, including the dates listed below, in the Southern District of Ohio and elsewhere, the defendants,

**DANIEL EMERSON NORTON, and**

13

## TIMOTHY M. KELLY

did knowingly conduct and attempt to conduct financial transactions totaling approximately $2,137,363.18, affecting interstate commerce, and which transactions involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions, that is, funds, in the approximate amounts listed below, represented the proceeds of wire fraud:

| Count | Date of Offense | Company | Financial Transaction with Emerson Company |
|-------|-----------------|---------|---------------------------------------------|
| 33 | Oct. 30, 2012 | Company #2 | Check #135 in the amount of $47,534.47, which included payment for POs #2819 and #6356 |
| 34 | Nov. 8, 2012 | Company #2 | Check #136 in the amount of $31,589.08, which included payment for PO #0369 |
| 35 | Oct. 15, 2012 | Company 32 | Check #134 in the amount of $100,306.26, which included payment for POs #1256 and #4560 |
| 36 | July 25, 2012 | Company #4 | Electronic transfer of $35,631.90, which included payment for PO #1624 |
| 37 | Feb. 11, 2013 | Company #4 | Electronic transfer of $2,783.88, which included payment for PO #0307 |
| 38 | July 30, 2012 | Company #5 | Wire transfer of $36,315.00, which included payment for PO #4390 |
| 39 | Mar. 12, 2012 | Company #5 | Wire transfer of $62,403.58, which included payment for PO #0954 |
| 40 | Mar. 26, 2012 | Company #5 | Wire transfer of $90,383.20, which included payment for PO #6514 |
| 41 | Sept. 4, 2012 | Company #5 | Wire transfer of $100,253.00, which was payment for PO #0363 |
| 42 | Oct. 29, 2012 | Company #6 | Check #1025 in the amount of $25,223.24, which included payment for PO #6961 |
| 43 | May 18, 2012 | Company #6 | Check #1009 in the amount of $27,093.70, which included payment for POs #1701 and #1856 |
| 44 | Oct. 22, 2012 | Company #6 | Check #1024 in the amount of $59,646.45, which included payment for PO #4229 |

| 45 | Oct. 31, 2012 | Company #6 | Check #1027 in the amount of $98,010.01, which included payment for POs #2914 and 5444 |
| 46 | Dec. 3, 2012 | Company #6 | Check #1031 in the amount of $61,304.85, which included payment for POs #LE54 and #JQ22 |
| 47 | Aug. 21, 2012 | Company #6 | Check #1017 in the amount of $88,763.06, which included payment for PO #4227 |
| 48 | July 30, 2012 | Company #6 | Check #1014 in the amount of $31,822.65, which included payment for PO #2464 |
| 49 | Aug. 15, 2013 | Company #8 | Check #105 in the amount of $2,080.58, which included payment for PO #8220 |
| 50 | Mar. 5, 2013 | Company #9 | Check #1316 in the amount of $6,172.60, which included payment for PO #2266 |
| 51 | Aug. 9, 2013 | Company #9 | Check #1249 in the amount of $45,899.05, which included payment for PO #1057 |
| 52 | Apr. 17, 2013 | Company #9 | Counter Check in the amount of $28,071.62, which included payment for PO #MV20 |

**All in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2.**

**COUNT 53**
(Money Laundering)

36.    The factual allegations set forth in Paragraphs 1 through 20 of the Introduction Section of this Indictment are re-alleged and fully incorporated by reference herein.

37.    The allegations set forth in Counts 1 through 31 and 33 through 52 are also incorporated by reference herein.

38.    On or about March 8, 2013, 621 Kaiola Street was purchased in the name of Defendant **EMERSON MANUFACTURING COMPANY, INC.** for $352,000.

39.    On or about May 21, 2012, in the Southern District of Ohio, the defendants,

**DANIEL EMERSON NORTON,**
**TIMOTHY M. KELLY, and**
**EMERSON MANUFACTURING, INC.**

15

did knowingly engage and attempt to engage in a monetary transaction by through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the withdrawal of $40,000 from Emerson Company bank account ending x1971, which was used to purchase a Cashier' Check for the same amount, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343 as described above, and which Cashier's Check was provided to Old Republic Title and Escrow as a down payment on the purchase of the property located at 621 Kaiola Street.

**All in violation of Title 18, United States Codes, Sections 1957 and 2.**

## FORFEITURE A

40.    The allegations contained in Count One through Thirty-One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

41.    Upon conviction of any the offenses in violation of 18 U.S.C. §§ 1343 or 1349 as set forth in Counts One through Thirty-One of the Indictment, the defendants, **DANIEL EMERSON NORTON** and **TIMOTHY M. KELLY** shall forfeit to the United States of America any property constituting, or derived from, proceeds obtained, directly or indirectly as a result of the such violation including but not limited to a $2,137,363.18 in the form of a forfeiture money judgment, which represents a conservative estimate of the net proceeds obtained as a result of the activity as outlined in Count One through Thirty-One of the Indictment in the form of a forfeiture money judgment.

(a) The Contents of Bank of America Account ****0263, held in the name of Emerson Manufacturing Company, Inc. containing $333,230.08, as proceeds directly traceable to the violation(s) as described in Count One through Thirty-One of the Indictment in partial satisfaction of the $2,137,363.18 forfeiture money judgment.

**Substitute Assets**

42.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the value of the above-described property if, as a result of any act or omission of the defendants, **DANIEL EMERSON NORTON** and **TIMOTHY M. KELLY** the forfeitable property so described, or any portion thereof;

  (a)     cannot be located upon the exercise of due diligence;

  (b)     has been transferred or sold to, or deposited with a   third party;

  (c)     has been placed beyond the jurisdiction of the court;

  (d)     has been substantially diminished in value; or

  (e)     has been commingled with other property which cannot be  divided without
          difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the remaining value of the $2,137,363.18 forfeiture money judgment.

**All in accordance with Title 18, United States Code § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and Rule 32.2(a), Federal Rules of Criminal Procedure.**
**FORFEITURE B**

43. The allegations of Count 52 are realleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America pursuant to 18 U.S.C. §982(a)(1).

44. Upon conviction of the violation as alleged in Count 52 of the Indictment, the Defendants **DANIEL EMERSON NORTON, TIMOTHY M. KELLY,** and **EMERSON MANUFACTURING COMPANY, INC.** shall forfeit to the United States under 18 U.S.C. §982(a)(1) any property real or personal, involved in a transaction or attempted transaction or offense in violation of 18 U.S.C. §1957 or conspiracy to commit such offenses, for which the defendant is convicted, and all property traceable to such property, including but not limited to the following:

(a) Real Property and improvements thereon known and numbered as 621 Kaiola Street, Kihei, Hawaii, 96753 with all improvements, appurtenances and attachments thereon, and legally described as:

Situated in the State of Hawaii, County of Maui and described as follows:

All that certain parcel of land situate at Makawao, Island and County of Maui, State of Hawaii, described as follows:

Lot 114, area 7,768 square feet, more or less, as delineated on the map entitled "KA'ONO'ULU ESTATES, PHASE I", which said map was filed in the Bureau of Conveyances of the State of Hawaii as File Plan No. 2075.

**SUBJECT HOWEVER TO THE FOLLOWING:**

1. Attention is invited to the fact that the premises covered herein may be subject to possible rollback or retroactive property taxes due to possible loss of exemption status.

2. Title to all minerals, and metallic mines reserved to the State of Hawaii.

3. Agreement for          SUBDIVISION (LARGE LOTS)
   Executed By     :     KAONOLULU RANCH COMPANY, LIMITED, a Hawaii
                         corporation

and Between        :        the COUNTY OF MAUI

On the terms, covenants and conditions contained therein,

Dated:   October 1, 1980
Recorded: January 28, 1981 in the Bureau of Conveyances, State of Hawaii, in
Book 15309, Page 466

4. Agreement for    :        SUBDIVISION (THREE LOTS OR LESS)
   Executed By      :        KAONOULU RANCH COMPANY, LIMITED, a
                             Hawaii corporation
   And Between      :        the COUNTY OF MAUI

On the terms, covenants and conditions contained therein,

Dated:   October 1, 1980
Recorded: February 2, 1981 in the bureau of Conveyances, State of Hawaii, in
Book 15318, Page 546

5. CERTIFICATE OF LONG-TERM RESIDENTIAL USE
   Dated:   September 28, 1989
        Recorded: October 3, 1989 in the Bureau of Conveyances, State of Hawaii, in
        Book   23724, Page 508
   By: HORITA-MAUI, INC.

6. CERTIFICATE OF LONG-TERM RESIDENTIAL USE
   Dated:     September 28, 1989
   Recorded: October 3, 1989 in the Bureau of Conveyances, State of Hawaii, in
        Book 23724, Page 510
        By    : HORITA-MAUI, INC.

7. NOTICE
   Dated:     June 18, 1990
   Recorded: June 28, 1990 in the Bureau of Conveyances, State of Hawaii, as
        Document No. 90-097888
   By:       HORITA-MAUI, INC.
   Re : Kihei Wastewater Treatment Capacity

8. Agreement for: Conditional Zoning

   On the terms, covenants and conditions contained therein,
    Dated:  October 18, 1991
    Recorded: November 7, 1991 in the Bureau of Conveyances, State of Hawaii,
    as Document No. 91-153553

19

9. Terms and conditions of that certain Acknowledgement made Horita-Maui, Inc. dated October 5, 1991, recorded November 18, 1991 in the Bureau of Conveyances, State of Hawaii, as Document No. 91-158124, re: sewerage system capacity at the Kihei Waste Water Treatment facility and the availability thereof.

10. Agreement for  : SUBDIVISION (LARGE LOTS)

    Executed By     : HORITA-MAUI, INC.

    On the terms, covenants and conditions contained therein,

    Dated:   November 15, 1991
    Recorded:  December 9, 1991 in the Bureau of Conveyances, State of Hawaii,
      as Document No. 91-168169

11. Covenants, Conditions and Restrictions, but omitting any covenants or restrictions if any, based upon race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that said covenant (a) is exempt under Title 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons, as provided in an instrument.

Entitled:      DECLARATION OF PROTECTIVE COVENANTS FOR
               KA'ONO'ULU ESTATES
Dated:         February 27, 1992
Recorded:      March 11, 1992 in the Bureau of Conveyances, State of Hawaii, as
               Document No. 92-035453

12. Agreement for:   HOLD HARMLESS AGREEMENT
    Executed By:  COUNTY OF MAUI
    And Between: HORITA-MAUI, INC., a Hawaii corporation

    On the terms, covenants and conditions contained therein,

    Dated:      November 7, 1994
    Recorded:  in the Bureau of Conveyances, State of Hawaii, as Document No. 94-201929

    RE: Wastewater treatment capacity

13. Restriction of vehicular access as shown on the map of File Plan No. 2075.

14. Terms and provisions as contained in an instrument,

Entitled:    CERTIFICATION OF LONG-TERM RESIDENTIAL USE

Dated:     February 24, 1995
Recorded:  in the Bureau of Conveyances, State of Hawaii, as Document No.
            95-026256

15. Covenants, conditions, restrictions, reservations, agreements, obligations, easements and other provisions set forth in Deed dated March 1, 1995, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. 95-034056, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or natural origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c) or Section 515-6,HRS.

**Being all the property described in the following:**

Deed
Recorded:  March 8, 2013 in the Bureau of Conveyances, State of Hawaii, as
            Document No. A48150440A
Grantor:    KIMBERLY CURTIS, single, as Tenant in Severalty
Grantee:    EMERSON MANUFACTURING COMPANY

Property Address: 621 Kaiola Street, Kihei, Hawaii, 96753.
Tax Map Key: 2-3-9-048-114
Parcel Number 390481140000.
Record Owner: Emerson Manufacturing Company.

**All in accordance with Title 18, United States Code, §982(a)(1) and Rule 32.2(a), Federal Rules of Criminal Procedure.**

A True Bill.

_____
Grand Jury Foreperson

BENJAMIN C. GLASSMAN
United States Attorney

J. MICHAEL MAROUS
JESSICA W. KNIGHT
Assistant United States Attorneys