# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:17-cr-50** |
| **vs.** | ) | **JUDGE MICHAEL H. WATSON** |
| | ) | |
| **DANIEL EMERSON NORTON,** | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Defendant Daniel Emerson Norton ("Defendant" or "Norton"). With unmitigated gall, Defendant, driven by greed and arrogance, lead a conspiracy that threatened the safety of thousands of men and women of the United States Army, Navy, Air Force, and Marines. For the reasons set forth herein, and pursuant to the Rule 11(c)(1)(C) plea agreement, the United States recommends that Defendant be sentenced to a term of 119 months of imprisonment, followed by three years of supervised release, and a special assessment of $300. The United States also requests that the Court order Defendant to pay $2,229,142.40 in restitution,[1] jointly and severally, to the Department of Defense ("DoD") and order the forfeiture of the contents of Bank of America account xxxx0263, held in the name of Emerson Manufacturing Company, Inc., containing approximately $333,230.08 in United States currency. Defendant's interest in the real property known and numbered as 621 Kaiola Street, Kihei, Hawaii 96753[2] with all improvements, appurtenances, and attachments thereon also should be forfeited.

---

[1] The PSR recommends restitution in the amount of $2,384,025.71, which also includes costs incurred with the testing of the parts at issue in this case.

[2] Parcel Number: 390481140000; Record Owner: Emerson Manufacturing Company

# I.   FACTUAL BACKGROUND

## A.  The DLA Contracting Process

The DoD contracts through various agencies, including the Defense Logistics Agency ("DLA"). DLA is the United States' combat logistics support agency, providing support for the military and other federal agencies. DLA sources nearly all of the items our military needs to operate, including nearly 90% of the military's spare parts and equipment. DLA Land & Maritime ("DLA L&M") is located in Columbus, Ohio and is the lead element for supplying and sustaining land and maritime weapon systems and helping the military services plan for future demand.

In order to conduct business with the DoD, potential contractors are required to register with the System for Award Management ("SAM") and obtain a Commercial and Government Entity ("CAGE") code. The CAGE code is a unique 5-character identification number assigned by DLA to suppliers of various government or defense agencies. The CAGE code is used in a variety of systems throughout the government and provides a standardized method of identifying a given facility at a specific location. Once a company is registered with SAM and has a CAGE code, it may bid on government contracts issued by the DoD.

The DoD issues "Solicitations," or Requests for Quotation ("RFQs") electronically through a web-based application called DLA's Internet Bid Board System ("DIBBS"). The posted RFQs contain the DoD requirements and can include part drawings and specifications used by a potential contractor in order to ensure that the part is made or sourced correctly. Potential contractors can access DIBBS to search for, view, and submit secure quotes on the RFQs. The potential contractors are required to have a quality control system in place to insure the parts they supply to the DoD are in accordance with DoD drawings and specifications. When authorized by the Contract Administration Office, the contractor may submit a Certificate of Conformance ("CoC") with the

shipment of parts to the DoD. CoCs are used in lieu of an inspection at the source and must be signed and dated by the contractor.

Once parts are shipped to DLA, contractors enter the shipping and invoicing information electronically, through a secure web-based system, which allows the government to receive notice of the completed contract and pay the contractor electronically. Upon receipt of an invoice, DLA, through the Defense Finance and Accounting Service ("DFAS"), located in Columbus, Ohio, issues payment electronically to the supplying contractor.

### B. Emerson Company and Proxy Bidding Scheme

Emerson Company, through Defendant Norton, was issued CAGE Code 4BUR2 on March 8, 2006. Norton was listed as the DLA primary point of contact. According to a description previously listed on the company website, Emerson Company ". . . is a designer, manufacturer and distributor of quality products and product components. The company provides contract manufacturing services to aerospace, defense and commercial markets." Emerson Company and Norton were debarred by DLA from doing business directly with the United States from June 14, 2011 to June 13, 2014.

In order to grow his business, and, once debarred, to continue doing business, Defendant developed and implemented a scheme that involved recruiting other individuals and companies to bid on DLA contracts on his behalf. Beginning in approximately December 2010, Defendant began recruiting individuals and companies to obtain CAGE codes in order to submit bids on DLA contracts at Norton's direction, with the understanding that Norton would then perform the contracts. In total, Defendant convinced at least nine individuals and companies to act on behalf of Emerson Company. Norton assisted most of these individuals in obtaining the required CAGE codes. Once enlisted, Norton used these nine companies as his proxy in the DLA contract bidding

process, and, in exchange, the companies received 10% of the price of any awarded contract.

Defendant directed the companies' actions at each step of the proxy bidding process. Norton would identify the DLA contracts he was interested in, and then direct one or more of the nine enlisted companies to submit quotes on those contracts. Norton dictated the price and timeframes of the quotes, and often coordinated the quotes across the nine companies to thwart accountability processes and safeguards in place by DLA. Using nine companies, in effect, allowed Norton to bid multiple times on the same contract. For example, in relation to Count 11, the DoD issued a solicitation seeking bids for the provision of a cover assembly in support of military trucks. As shown in the figure below, four companies under Norton's control placed bids on this contract, just pennies apart, and one of them was awarded the contract.

```
Estimated Unit Price (MAUC):           Estimated Total Price:
       39.88                                  11964.00
ALPP adjusted allowing one percent increase over history
CAGE 6DAR5 was low evaluated small business offering a domestic end product and passed PACE pricing.

                               QUOTES RECEIVED BY RETURN DATE/TIME
Qualified Quotes:

       Total   Unit       Total     Total      Business    Buy               Delivery          Bid
CAGE   Qty     Price      Price     Eval Price  Size        American  Surplus  Days  FOB I&A  Type DCRL  ABVS
6DAR5  300     39.88000   11964.00  11964.00    B           D         N        107   D   D    BI
5AHR2  300     39.89000   11967.00  11967.00    B           D         N        105   D   D    BI    R
6C5Y5  300     39.95000   11985.00  11985.00    B           D         N        100   D   D    BI    G
5FP34  300     40.00000   12000.00  12000.00    B           D         N        110   D   D    BI
0V8C5  300     44.48000   13344.00  13344.00    B           D         N        090   D   D    BI
54799  300     48.55000   14565.00  14565.00    B           D         N        120   D   D    BI
```

This practice had the effect of giving Norton multiple attempts to secure each contract that he instructed the companies under his control to bid on. Additionally, his multiple bids were typically lower than legitimate bids because he was sourcing his parts from Chinese suppliers. By placing multiple bids in the same price range, he was able to effectively legitimize his bids by making them appear competitive, rather than appearing as the low outliers they truly were.

Norton's scheme also served to spread around the indicators of bad conduct that, if applied to one company, could have more quickly alerted the DLA to the offense conduct. As testified to

at trial by Alan Searfoss, a DLA contracting expert, one indicator the DLA uses to determine contractor performance is the Automated Best Value System ("ABVS") score. A company's ABVS starts at 100% and is essentially theirs to lose—through late or cancelled contracts, or poor performance. Because the nine companies under Norton's control were sharing the red flags that lowered their individual ABVS scores, it could conceivably take the DLA nine times as long to begin to see problems reflected in these companies' score.

| CAGE | Total Qty | Unit Price | Tota Pric | DLA ABVS Score | |
|------|-----------|------------|-----------|----------------|---|
| 6DAR5 | 300 | 39.88000 | | | 100.0 |
| 5AHR2 | 300 | 39.89000 | | R | 84.1 |
| 6C5Y5 | 300 | 39.95000 | | G | 100.0 |
| 5FP34 | 300 | 40.00000 | | | 999.9 |

DLA contract administrators regularly divert awards away from companies with low ABVS scores.

```
This buy dropped for manual because:

      CAGE 1RZM2 LOW EVAL QUOTE/ABVS SCORE BELOW 70
```

By sharing the score deductions for Norton's conduct during the course of the scheme, the nine companies under his control were able to continue bidding on contracts longer than would be typical for a single company engaging in the same conduct. Therefore, use of multiple bidders protected Norton's scheme from discovery for a period of time, permitting him to acquire more contract awards, and make more money from his scheme by placing dangerous parts in the military chain of supply.

Furthermore, there were instances where, once a company under Norton's control was finally flagged for concerns regarding their contract performance, the DLA would divert a contract away from that company—and unknowingly give it to another company under Norton's control.

For example, in relation to Count 26, the DLA diverted the contract award from CAGE code 6C5Y5, a company under Norton's control, due to past contract performance issues. The DLA instead awarded the contract to CAGE code 6SWT4—another company under Norton's control. The result was that the DLA received the exact same part sourced from China that it sought to avoid by not giving the contract to 6C5Y5. Therefore, Norton's scheme of multiple bidders served to circumvent the internal contracting safeguards that the DLA relies upon to protect the military supply chain against poor performers and bad parts, increasing risk to military personnel.

When one of the nine was awarded a contract and obtained a Purchase Order (PO) from DLA, Defendant Norton would direct that proxy company to send the PO to himself and/or Kelly. Defendant Norton and Kelly handled the ordering and shipping of the parts to the DoD. The proxy company was relatively uninvolved with the post-award process, and, with few exceptions, the company never saw the parts prior to them being shipped to the DoD. The proxy company remained uninvolved until they received an e-mail from Emerson Company with all of the information needed to electronically invoice DFAS and receive payment. Once invoiced, DFAS would then electronically transfer the money into the company's bank account. Per the arrangement, the company paid Emerson Company 90% of the payment received from DFAS.

During the post-award process, communication between the proxy company and DLA was managed primarily by Defendant Norton. If DLA reached out to the company with a specific question or request related to a particular contract, the proxy company would forward these emails to Defendant Norton and/or Kelly for a response. For example, if DLA sought traceability documents validating the origin of a particular part, Norton would often advise the company to disregard or ignore the DLA inquiry. Norton was also aware that the nine companies were routinely

providing CoCs to Kelly for inclusion with the shipment of the parts. Norton and Kelly required the nine companies sign the CoCs despite the fact that inspection records were not obtained from the actual manufacturers, inspections were not regularly being conducted by Emerson Company, and the nine companies did not receive parts for inspection prior to their shipment to the DoD.

Through this proxy bidding scheme, Defendant knowingly provided bad parts and introduce unacceptable risk into the supply chain of the United States military.[3] Out of those 134 contracts, 107 were for Critical Application Items. Critical Application Items are those parts that have been determined by the United States military service to be essential to weapon system performance or operation, or the preservation of life or safety of operating personnel. Through those 107 contracts, Defendant Norton caused at least 306,822 nonconforming Critical Application Items to be delivered to military supply depots and bases. Defendant Norton's scheme endangered the lives of United States military personnel and caused significant financial harm to the DoD totaling more than $2.2 million.

### C. Obstruction of Justice

As if manipulating the DoD contract bidding process and providing non-conforming parts to the United States military for a profit was not enough, Defendant knowingly, intentionally and repeatedly engaged in conduct intended to cover up his scheme to defraud. For example, at Norton's direction, one of the nine proxy companies bid on and was ultimately awarded contract ending 5097 to provide slab head bolts that are used to mount engines on C-130 Hercules and B-52 Stratofortress aircraft. This was a "code and part" contract, which means that it required a specific part from one of seven specified domestic manufacturers that were listed in the contract

---

[3] For a complete discussion of Norton's role in the procurement of non-conforming parts from China and the associated failures of those parts, the United States respectfully directs the Court to its submission regarding the potential testimony of David Loughman.

specifications. Instead, on September 23, 2011, Defendant ordered 3,000 of these bolts from his Chinese supplier, which were subsequently shipped to the DoD by Emerson Company. In other words, by Norton's own hand, these parts were defective and in violation of the contract right out of the gate.

On or about March 5, 2013, Defendant Norton, Kelly and Emerson Company were proposed for an extension of their original debarment. The basis of the proposed debarment was the defective bolts acquired by and then supplied by Norton when he blatantly disregarded the OEM terms of the contract; thus, providing non-conforming *critical application* slab head bolts as a subcontractor. In an effort to prevent the extension of their debarment, Defendant and Kelly submitted false documents to the DLA attempting to blame the proxy company for the non-conforming parts. Specifically, Defendant and Kelly submitted a letter dated March 12, 2013, which suggested that Emerson Company made the particular bolt in accordance with a drawing that the proxy company had approved. The letter was signed by Defendant in his personal capacity and on behalf of Emerson Company. Defendant also submitted false invoices and Purchase Orders purporting to show the purchase of the parts by the proxy company from Emerson Company as well as the purported drawing used by Emerson Company to make the parts in question. Defendant knew, however, that the drawing had been commissioned by Emerson Company six months prior after Norton learned of an investigation by the Air Force into these bad parts which were used on aircraft engines, and that the purchase orders and invoices were created solely for the purpose of supporting the fraudulent letter to the DLA. Defendant well knew that he had ordered the bolts from China and they did not conform to the contract requirements because he avoided use of the required OEM's in filing the contracts.

Additionally, on August 21, 2013, a Federal Grand Jury Subpoena addressed to Emerson

Company, was served on Kelly. The subpoena generally called for the production of documents related to the quoting, ordering, manufacture, inspection, corresponding, and sale of all parts to the DoD, through eight of the nine companies. From on or about August 22, 2013 and continuing until at least January 29, 2014, Defendant corruptly obstructed and impeded, a federal Grand Jury investigation, which is an official proceeding, by falsely communicating to his attorney or allowing such information to be communicated to his attorney, with the intent that the information be communicated to the United States as it related to its grand jury investigation, that, among other things, there existed fewer than the actual number of employees and staff at Emerson Company after Emerson's debarment and up to and including the time period in which the investigation commenced, where Defendant knew that there were more employees and staff at Emerson during the specified timeframe than represented to his attorney.

Defendant also knew that electronic records maintained on company computers, and that would be responsive to the Federal Grand Jury Subpoena, had been destroyed in furtherance of obstructing the criminal investigation. He falsely communicated to his attorney, and allowed the same to be conveyed to the United States, that only two computers contained responsive information and did not disclose the destruction of evidence.

## II.  PROCEDURAL HISTORY

On June 26, 2018, a federal grand jury returned a Second Superseding Indictment charging Defendant Norton with Count 1, Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; Counts 2-31, Wire Fraud, in violation of 18 U.S.C. § 1343; Counts 32-51, Concealment Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; Count 52, Money Laundering, in violation of 18 U.S.C. §§ 1957 and 2; Count 53, Conspiracy to Destroy Documents, in violation of 18 U.S.C. §§1512(k) and 2; Count 54, Conspiracy to Tamper with Documents or

Proceedings, in violation of 18 U.S.C. §§ 1512(k) and 2; Counts 55-57, Tampering with Documents or Proceedings, in violation of 18 U.S.C. §§ 1512(c)(1) and 2.

On April 15, 2019, after several days of trial, Defendant Norton pled guilty to Counts 1, 38, and 56 of the Second Superseding Indictment pursuant to a plea agreement. Defendant Norton agreed to pay restitution in an amount of $2,229,142.40, the forfeiture of the contents of Bank of America account xxxx0263 (held in the name of Emerson Manufacturing Company, Inc.) containing approximately $333,230.08 in United States Currency, and the Defendant's interest in the real property known and numbered as 621 Kaiola Street, Kihei, Hawaii 96753.

### III.     U.S. SENTENCING GUIDELINES

a.    *Statutory Maximum Sentence*

The maximum sentence for Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349) and Tampering with Documents or Proceedings (18 U.S.C. § 1512(c)(1)) is a term of imprisonment up to twenty years, a fine not to exceed $250,000, and up to three years of supervised release. The maximum sentence for Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i)) is a term of imprisonment up to twenty years, a fine not to exceed $500,000 or twice the value of the property involved in the transaction, and up to three years of supervised release.

b.    *Sentencing Guidelines Calculation*

In imposing a sentence, the Court must take into account the sentencing factors set forth in 18 U.S.C. §3553(a). *United States v. Booker*, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). As the PSR correctly calculates, the base level is 7; with an adjustment of total loss to the DoD of more than $1.5 million (+16); adjustment for a violation of any prior, specific judicial or administrative order, injunction, decree,

or process (+2); adjustment for the offense involving sophisticated means (+2), adjustment for the offence involving the conscious or reckless risk of death or serious bodily injury (+2); adjustment for defendant convicted under 18 U.S.C. § 1956 (+2); adjustment for defendant acting as an organizer or leader of the criminal activity that involved five or more participants (+4); adjustment for willful obstruction of the administration of justice (+2); and adjustment for acceptance of responsibility (-2). The total adjusted offense level is 35. Defendant is a Criminal History Category I, which, at an offense level 35, corresponds to a guideline range 168–210 months.

Consistent with the Rule 11(c)(1)(C) Plea Agreement in this case, the PSR recommended a term of 119 months imprisonment, followed by three years of supervised release, a special assessment of $300, forfeiture of real property located at 621 Kaiola Street, Kihei, Hawaii 96753, and forfeiture in the amount of $2,151,118.90 including $333,230.88 deposited in account ending in ****0263. The PSR further recommended restitution in the amount of $2,384,025.71, which included testing costs.

      c. *Objections to the PSR*

There are three outstanding objections by Defendant to the PSR relating to Defendant's role in the destruction of the computers, the Government's contention that Defendant placed potentially thousands of lives at risk with his criminal behavior and Defendant's overall role as a leader in this scheme.

As to the first objection, Defendant requests that the PSR reflect that Timothy Kelly and R.S. destroyed company computers without his assistance or direction. The United States submits that Mr. Kelly testified at trial that he spoke with Norton regarding the plan to destroy office computers prior to their actual destruction, and thus Norton was aware of the plan to destroy the computers even though he was not present for the actual destruction. Norton then subsequently

failed to disclose to his defense attorney when responding to questions posed by the United States that the computers, which contained responsive records, had been destroyed.  In the end, Defendant pleaded guilty to obstructing justice with respect to the falsification of documents and the misleading of the United States and its investigation through false statements made to his counsel, so any obstruction enhancement would still apply.

Defendant also objects to the Government's contention that providing non-conforming parts could have resulted in the loss or life or serious injuries. However, as part of this case, Emerson filled 107 contracts for critical application items and delivered at least 306,822 faulty parts that are used in critical applications.  As defined above, critical application items are those parts that are essential to weapon system performance or operation, or the preservation of life or safety of operating personnel. In some cases, multiple lives depend on a single part. For example, the Externally Relieved Slab Head Bolts are relied upon by the 128 combat troops carried in some configurations of a C-130, in addition to the flight crew.  B-52 bombers, which also rely on the Externally Relieved Slab Head Bolts, carry a 70,000 pound weapon payload, including nuclear ordinance, in addition to the flight crew.  In some extreme examples, engine loss on a B-52 carrying nuclear ordinance could affect tens of millions of lives. This is to say nothing in the potential costs of mission failure due to a part, which could have national security implications.  Thus, the United States submits that it is not speculation that Norton's knowing and intentional decision to provide the United States military with non-conforming critical application items could have resulted in the loss of life or serious injuries.

Finally, Defendant argues that Timothy Kelly is an equally culpable co-conspirator because he managed a comparable number of employees/co-conspirators and had equal access to the bank accounts and therefore, Norton deserves a 2 level decrease based on role. It is true that Defendant

and Mr. Kelly both conspired to defraud the DoD. Both played specific roles in that conspiracy, but they were not equal roles. Norton was <u>solely</u> responsible for (1) recruiting the nine proxy companies, (2) setting up the compensation structure between the nine companies and Emerson Company (90/10 split), (3) directing the nine companies to bid on DoD contracts, (4) procuring each of the 300,000 plus parts provided to the DoD, (5) the decision to procure parts from China in violation of the Buy American Act, (6) authorizing any deviations on the parts provided to the DoD that resulted in non-conformities,[4] and (7) recruiting and hiring Timothy Kelly. He also was primarily responsible for answering questions about how to respond to inquiries by the DoD, directing at least some of the nine companies when questioned about it to complete the CoCs and assuring them of part quality, advising the nine, where applicable, on how to proceed with any government inspections of parts or facilities and inspecting parts on an as requested basis or by 2012-2013 on a more regular basis. In contrast, Mr. Kelly was only responsible for inspecting parts (regarding which, if issues arose, he would consult Defendant Norton); emailing the nine companies when the parts were ready to be shipped to coordinate the signing of the CoCs and invoicing of DFAS; and shipping the parts. Whereas Mr. Kelly's roles were perfunctory to the process Defendant Norton had created, Defendant was clearly the decision maker, leader, and organizer of this fraud, and, thus, is deserving of the 4 level enhancement.

## IV.     THE PROPER SENTENCE

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2)

---

[4] For a complete discussion of how Norton's approval of deviations from the contract specifications directly lead to the associated failures of those parts, the United States again respectfully directs the Court to its submission regarding the potential testimony of David Loughman.

the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

A. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

Defendant Norton knowingly and intentionally implemented a contract bidding scheme involving nine proxy companies acting at his direction to circumvent accountability processes and safeguards in place by DLA, and thereby harmed its ability to procure parts needed by the United States military services. Furthermore, legitimate companies attempting to compete on these contracts were frequently excluded from consideration by the function of Norton's scheme. He also knowingly and intentionally provided parts to the DoD that did not conform to the contract requirements, jeopardizing the mission and safety of United States military personnel. Importantly, these parts were non-conforming because Norton either authorized a deviation from the contract requirements, failed to provide sufficient information to make the part in conformance or simply procured it from his Chinese supplier rather than the required manufacturer.

Norton's decision to procure the cheapest part from China, regardless of contract requirements, generated profits at the expense of the United States and those service members sworn to protect him. For example, contracts ending 1551 and 2619 required the provision of a Frangible Electrical Switch Cover. Norton paid his Chinese supplier, whom he failed to provide

all the information necessary to make the correct part, only $0.18 per part, but sold them to the DoD for $7.71 each. The designation of these parts, and 106 others, as "critical application items" also meant that they were essential to the safety of operating personnel. Especially during times of conflict, the United States military must be able to rely on the parts supplied by contractors.

Norton's criminal conduct, especially as a debarred contractor, make it clear that neither he, nor the parts Emerson Company supplied, could be relied upon by our military services. In addition to the specific examples provided to the Court by separate submission, there is yet another communication by Defendant that stands out. After having difficulty finding a manufacturer in China for a Light Indicator, Norton finally asked his usual Chinese supplier "how much would it cost to copy it just as it is with no guarantee on function?" Thankfully, no supplier was found willing to copy the part as Norton requested. In drawings Norton sent to China thereafter, he would typically simplify the drawings of complex parts by redacting specifications—or entire pages— from the drawing. This made the drawings simpler to read, and impossible to create to the correct, omitted specifications. It also became Norton's typical practice to redact any indicator that the end user of the part would be the United States military services.

In real time email communications, Norton acknowledged that he was simply doing a cost-benefit analysis when he would be faced with a decision on whether to send the correct part. In one instance, when confronted about sending non-conforming parts by G.P., one of the nine individuals that Norton instructed to place bids, Norton admitted that "[w]e do the best we can while weighing the consequence of sending incorrect parts against the cost of scrapping or shelving product." Thus, in one statement, Norton admitted to knowledge he was sending incorrect parts, displayed a willingness to send incorrect parts regardless of the defects, and admitted that he performed a cost-benefit analysis to determine whether to send defective parts to the military after

discovering that they were defective. Defendant's own words reveal to the Court his true character and one of many reasons why a lengthy term of imprisonment is necessary in this case.

The trial testimony of Justin Ayers and post-trial testimony of U.S. Air Force mechanic Clayton Solberg also support the great lengths Norton undertook to deceive those around him, resulting in a cheap substitute and defective and dangerous parts being used by the "Warthog" mechanics. The "Alcoa nut" was an OEM part that only had a single legit supplier. Nevertheless, he deceived Ayers about obtaining the part from China and not the approved source and then, after DLA told Norton that the part was defective, he continued to use a foreign source rather than Alcoa. Ayers even challenged him on the origin of the part and he persisted with his lies, which threatened the very military protecting his liberty.

Lastly, this Court cannot overlook the obstruction of justice in this case by Norton – whether it was affirmatively making misrepresentations to DLA about the procurement of the slab head bolts that were failing in the field, allowing his prior counsel to make false representations to the United States as part of a federal grand jury investigation, or the destruction of relevant evidence. Defendant was committed to the success of his scheme to defraud and subsequently, getting away with it, and nothing—not even a federal criminal investigation—stopped Norton from trying to avoid responsibility for his criminal actions. The United States submits that the time has come to hold Norton responsible, and that his conduct demands a sentence of 119 months of imprisonment.

**B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide for Just Punishment. Additionally, the Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.**

A sentence at the high-end of the agreed upon range is necessary to reflect the seriousness of the offense, promote respect for the law and provide for a just punishment. The egregiousness

of Norton's criminal conduct shows his complete lack of concern for our war fighters, his disrespect for the DoD and its agencies, and his contempt for the criminal laws of the United States.

A sentence of 119 months of imprisonment also affords adequate deterrence to criminal conduct – especially general deterrence, which is the primary goal. This Court must send a strong message to others who view the government contracting arena as an easy target for fraud. There must be consequences that address the greed that motivates individuals to fleece the DoD through the provision of bad parts for profit – using his knowledge of the system to prey on a large government program – and put our military service members in potential danger. Finally, there is a need to protect the public from Defendant and his willingness to overlook the safety of others in order to save a buck, and then lie about it later.

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

Given that the Plea Agreement contemplates a sentence below the guideline range, any disparity with similarly situated defendants who received guideline sentences would be to Defendant's benefit in this case. Moreover, the Court is called upon to consider the question of disparity at a national level – not between co-defendants. *See e.g.*, *United States v. Verduzco*, 558 F. App'x 562, 568 (6th Cir. 2014) (where the court noted that even if co-defendant, who received a sentence five years shorter than defendant's sentence, was young, healthy, and a far worse actor in the drug conspiracy, district court was not required to consider the disparity between defendant's and co-defendant's sentence, under statutory sentencing factor requiring consideration of the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; statutory sentencing factor was concerned with national disparities).

In this case, the United States anticipates that Defendant Norton will receive the longest sentence because his conduct was the most egregious, and he therefore has the greatest criminal culpability. Norton was the leader of this scheme. Each other person involved was recruited and trained by Norton, and each played their part in the scheme as he directed. Defendant's primary roles were to recruit, train, direct, and instruct the other members of the conspiracy; to select which contracts would be bid on, by whom, at what price, and in what timeframe; to control expenditures related to the contracts; to procure the parts for each contract; and, at times, to inspect and approve the parts. In his role as the <u>sole</u> procurer of parts, <u>only Norton</u> was directly responsible for the fact that those parts were defective. The parts involved in this case were ordered by Norton via email with his Chinese supplier, and no other person was a party to the vast majority of those emails.

Because Norton's numerous roles in the scheme afford him greater culpability, his conduct is not "similar" to that of his co-defendant Mr. Kelly, any disparity in sentencing between the two defendants is appropriate, and the requested sentence of 119 months will not create an unwarranted disparity. *See e.g.*, *United States vs. Dimora*, 750 F.3d 619, 632 (6th Cir. 2014) *rehearing en banc denied, certiorari denied* 135 S.Ct. 223, 190 L.Ed.2d 133, *certiorari denied* 135 S.Ct. 504, 190 L.Ed.2d 379, *post-conviction relief denied* 2018 WL 5255121 (where the court explained that the Defendant's 121-month sentence for bribery was not unreasonable, despite alleged disparities between his sentence and sentences received by co-conspirators; several of the co-conspirators cooperated with the government, and all but one of the others pled guilty, while defendant did neither of those things); *United States v. Conatser*, 514 F.3d 508, 522 (6th Cir. 2008) ("Disparities between the sentences of coconspirators can exist for valid reasons, such as differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government").

While both Defendant Norton and Mr. Kelly conspired to defraud the DoD, their specific conduct and role should inform the proper sentence that is proportionate to their culpability. Only Norton approved the manufacture of non-conforming parts. Only Norton made the decision to avoid the OEM suppliers on critical application aircraft parts. Only Norton provided incomplete, often redacted, drawings and technical specification packages to his Chinese supplier—which made it impossible to produce the correct part—and only Norton caused the delivery of bad parts by approving the manufacture of incorrect parts. Accordingly, only Defendant Norton is deserving of a sentence that reflects his personal involvement in those specific decisions and actions.

**D. The Need to Provide Restitution to Any Victims of the Offense.**

The Defendant has agreed to pay a restitution of $2,229,142.40, forfeit the contents of Bank of America account xxxx0263 (held in the name of Emerson Manufacturing Company, Inc.) containing approximately $333,230.08 in United States Currency, and forfeit his interest in the real property known and numbered as 621 Kaiola Street, Kihei, Hawaii 96753 with all improvements, appurtenances, and attachments thereon.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence Defendant Daniel Emerson Norton to a term of 119 months of imprisonment, followed by three years of supervised release, and a special assessment of $300. Additionally, the United States requests the Court order restitution in the amount of $2,229,142.40 to the United States Department of Defense, the forfeiture of the contents of Bank of America account xxxx0263 (held in the name of Emerson Manufacturing Company, Inc.) containing approximately $333,230.08 in United States currency, and the forfeiture of Defendant Norton's interest in the real property known and numbered as 621 Kaiola Street, Kihei, Hawaii 96753 with all improvements, appurtenances, and attachments thereon.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

s/ *J. Michael Marous*
J. MICHAEL MAROUS (0015322)
JESSICA W. KNIGHT (0086615)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-5653
Mike.Marous@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing Sentencing Memorandum was served electronically via the Court's CM/ECF system on this 7th day of November, 2019 upon Bradley Davis Barbin, Attorney for Defendant Daniel Emerson Norton.

s/ *J. Michael Marous*

J. MICHAEL MAROUS (0015322)
Assistant United States Attorney